NELSON P. COHEN
United States Attorney

KAREN L. LOEFFLER
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 W. 7th Avenue #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
email: karen.loeffler@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:06-cr-00004-JWS |
| Plaintiff, | |
| vs. | GOVERNMENT'S SENTENCING MEMORANDUM |
| WILLIAM E. ALLEN, | |
| Defendant. | |

COMES NOW the United States of America, by and through counsel and submits its sentencing memorandum in the above captioned case as follows:

I.   Factual Background

The Defendant in this case engaged in a long running scheme to defraud various institutions, companies and individuals by passing counterfeit instruments and attempting to obtain funds in what has been come to be seen throughout the

country as a "Nigerian Fraud Scheme."  As set forth in the indictment, Allen, beginning in September 2002 and continuing up until he was arrested on August 20, 2006, engaged in repeated acts of fraud all in the attempt to obtain funds through various fraudulent means.  Despite repeated advise from financial institutions and law enforcement, defendant continued to try and pass counterfeit instruments throughout the 3 year period of the scheme alleged in the indictment.  Indeed, in a search incident to his arrest on August 20, 2006, customs agents found another counterfeit check in his possession as he was returning to the United States after 8 months abroad.

As set forth in the indictment and repeated in the presentence report, Allen began passing counterfeit instruments in September 2002.  First he tried to pass a counterfeit check for $49,953 written on the Southwest Bank of Texas and paid to the order of Anchor International Ministeries (sic) Inc.  Despite being told that there was a hold on the check, Allen immediately tried to withdraw $10,000.  He was told on September 9, that the check was counterfeit and that he should stay away from the Nigerians as they were running a scam.

Despite that warning, Allen tried the same scam again 2 months later.  In November he deposited a counterfeit check for $50,000 into American First Bank and Trust.  This one purported to be written on a company in Georgia and listed

loan proceeds in the memo section. Allen immediately withdrew $47,000 by paying some bills, converting funds to cashier's checks depositing them in another bank and then wiring approximately $45,000 to Nigeria all in transactions under $10,000. Allen was again told by the bank that the check was counterfeit. Then, in March of 2002, Allen was interviewed by Special Agents of the Secret Service and the FBI and told again that this was all a fraud.

Again ignoring the repeated warnings of financial institutions and law enforcement Allen continued to try and obtain money through fraudulent instruments. In November 2003, he was stymied at FNBA when attempting to deposit another counterfeit check on an out of state company– this time for $115,000. Allen then had an associate try and deposit the next counterfeit check. This time, his associate had a counterfeit check for $49,282 that purported to be written on an account of Arctic Slope Regional Corporation ("ASRC"). FNBA would not take it, but suggested that Allen's associate get a cashier's check from KeyBank since the account was located there. KeyBAnk, to its detriment issued the cashier's check before learning that the ASRC check was counterfeit. Allen then caused the check to be negotiated at FNBA and, as with his previous actions, immediately transferred the money into another account and had his associate withdraw $47,000 in cash. The associate told law enforcement that Allen gave him

presigned checks to use to withdraw the cash. Having successfully worked the scam this time, Allen tried it again just a few days later using another associate and another counterfeit check purportedly from ASRC. This time KeyBank refused the check.

After that refusal, Allen went to using counterfeit postal money orders. Just days after the second ASRC check was rejected, Allen deposited 25 counterfeit postal money orders over a period of 3 weeks at 3 different branches of Credit Union One. In some instances he passed 5 counterfeit money orders at three branches literally minutes apart. Allen was informed by the Credit Union that the money orders were counterfeit. A few months later he was again interviewed by law enforcement and told them, among other things, that he did not want to be associated with checks like the ASRC checks because of the history of counterfeit checks.

On March 3, 2005, Allen signed an agreement stating that he owed the Credit Union approximately $22,894 for the 25 counterfeit money orders. Right after that he contacted another individual, a friend of his, to whom he owed some $25,000. He gave the individual another series of 23 counterfeit postal money orders in supposed payment of his debt and asked the individual to deposit them and return $7,500 so that Allen could get money owed to him out of Nigeria. That

individual is, of course, out the $22,000 in money from the counterfeit postal money orders.

    Allen made two more attempts to deposit counterfeit checks after this, in March 2005 and again in September 2005, before leaving the country.  Neither was successful.  Then, on his arrest, law enforcement found, among his documents, another counterfeit check for $11,378.02 purporting to be written to Allen from a company called Womack company located in Lousiana.  Upon further investigation conducted by Womack company and the Secret Service, agents learned that this check was the an altered copy of a check that had been written to Champion Elevator company.  The first check was stolen and negotiated by an individual with a Nigerian name.  The check that Allen had, had been presented to an Alaska financial institution at an earlier date, but rejected when the institution called Womack company to determine if they had written a check to Allen.

    Further upon publication of Allen's arrest, law enforcement was contacted by other individuals who stated that they had given Allen money based on his claims that he was owed large amounts of money by Nigerian companies and/or the government and they he just needed some funds to complete the transactions for getting funds out of Nigeria.

Another document in Allen's possession detailed more than 20 individuals to whom he owed over $250,000. Further investigation revealed that his ministry credentials had been revoked by the Church of God in Alaska because of complaints that Allen was borrowing money from church members purportedly with the same "Nigerian story" given above.

Throughout his contact with law enforcement, Allen always maintained versions of the common Nigerian story that he was owed large amounts of money from Nigeria, or was negotiating large contracts for Nigerian and just needed funds in order to obtain the large final payment. His actions however, show someone who was warned again and again that he was receiving counterfeit instruments. When too many banks began turning his deposits down, he sent associates to try and make deposits. When that did not work, he began passing counterfeit postal money orders. When caught at that scam he gave the counterfeit documents to a friend, causing him severe financial losses. The result of his schemes lead to approximately $145,000 in direct losses to financial institutions and attempts to obtain over $550,000 in more fraudulent gains.

II.    The Presentence Report

The government has one objection to the presentence report. That involves the 2 point adjustment for more than 10 victims. As noted in the presentence

report, victim is defined in §2B1.1 application note 1 as: "any person who sustained any part of the actual loss determined under subsection (b)(1)". Actual loss is defined as: "the reasonably foreseeable pecuniary harm that resulted from the offense." App. Nt. 3(A)(I). "'Reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known , was a potential result of the offense." With these definitions, the government believes that there are well over 10 victims of defendant's conduct defined by his overall scheme to obtain monies through the "Nigerian scam" detailed above.

    A.    List of Victims

The following in an incomplete list of victims attributable to Allen's conduct:

    1.    Alaska First Bank and Trust. – the victim of the check in Count

    2.    Alaska USA Federal Credit Union – the bank to which Allen transferred the fraudulently obtained funds he successfully obtained from AFBT which he then used to wire funds to Nigeria.

    3.    KeyBank – the victim in Count 4

    4.    FNBA – Another victim in Count 4

    5.    ASRC – victimized in count 4 by the debiting of their account

for purchase of the cashier's check negotiated at FNBA

  6. Credit Union One - the victim of the first set of counterfeit postal money orders.

  7. Richard Eaton– the victim of the second set of counterfeit postal money orders.

  8. Denali Alaskan Federal Credit Union–another victim of the second set of counterfeit postal money orders.

  9. Womack Inc. – the company caused to research the counterfeit check in Allen's possession on his arrest.

  10. Ron Cupples - an individual from whom Allen obtained $20,000 using the claim that the money was necessary to pay fees to get money owed to him from his Nigerian business. (Cupples later refused to Allen's request to wire him $6,700 Euro's in 2006, when he realized that he had been the victim of a scam.)

  11. Sandy McCullum - another individual who lent Allen money, approximately $3,000, under the same story provided to Cupples.

  12. Numerous other individuals– the victims of Allen's similar stories regarding the need to obtain funds to permit him to get money out of his Nigerian business.

U S v. Allen
3:06-cr-00004-JWS 8

    B.    Other Guideline Issues.

The only other difference between the plea agreement and the presentence report involves the application of Guideline section 2B1.1(b)(9). The presentence report assesses two points for sophisticated means. The plea agreement assesses two points for the fact that a substantial part of the fraudulent scheme was committed outside the United States. As either could apply to defendant's actions, the government does not believe that resolution of this matter is necessary for sentencing.

III.    Recommendation

The government recommends that the court accept the plea agreement which requires a sentence of 46 months – the top of the range for the guideline set calculation set forth in the presentence report or the bottom of the range set forth in the plea agreement. The government believes that this reflects an appropriate balancing of the factors set forth in 18 U.S.C. §3553(a). On the one hand defendant has acknowledged his guilt. On the other hand, his behavior throughout the scheme, repeatedly acknowledging his guilt, but then going on to repeat his criminal conduct, suggests that the deterrence and protection of the public may be the primary factors applicable to his actions. For the reasons stated above the

government respectfully requests that this court accept the plea agreement and impose the sentence contemplated therein.

RESPECTFULLY SUBMITTED this 15th day of June, 2007, in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/Karen L. Loeffler
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 W. 7th Avenue #9, Room 253
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
email: karen.loeffler@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2007,
a copy of the foregoing was served electronically, on:

Sue Ellen Tatter

s/ Karen Loeffler